UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TINA McCARTHY, an individual; et al., | ) |
| Plaintiffs, | ) 03:05-CV-00177-LRH-RJJ |
| v. | ) ORDER |
| WASHOE COUNTY SCHOOL DISTRICT; et al., | ) |
| Defendants. | ) |

Presently before the court is a Motion for Summary Judgment (# 57[1]) filed by defendants, Washoe County School District ("WCSD"), Mike Mieras ("Mieras") and Tom Kallay (collectively, "Defendants"). Plaintiffs, Tina McCarthy, Justin McCarthy and Daryl McCarthy, have filed an opposition (# 71), and Defendants replied (# 72).

**I. Factual Background**

This action arises out of alleged racial discrimination at Hug High School, a school within the Washoe County School District. The events leading to this action are undisputed. (Pls.' Opp'n (# 71) at 2.) Plaintiff Tina McCarthy ("Tina") is the mother of Daryl McCarthy ("Daryl") and Justin McCarthy ("Justin"). (Defs.' Mot. for Summ. J. (# 57), Dep. of Tina McCarthy, Ex. 1 at 13:2-10.) Daryl and Justin are both African American. *Id*. at 66:7-9. Justin was a student at Hug

---

[1] Refers to the court's docket number.

1  High School during the 2004-2005 school year.  (Defs.' Mot. for Summ. J. (# 57), Dep. of Justin
2  McCarthy, Ex. 5 at 11:3-12:15.)  Daryl was not a student at Hug High School during the 2004-
3  2005 school year.  (Defs.' Mot. for Summ. J. (# 57), Dep. of Daryl McCarthy, Ex. 4 at 12:10-17.)
4       In September, 2004, Daryl went to meet Justin at Hug High School.  *Id*. at 31:4-1.  At the
5  time, Daryl had a rat-tail comb with him.  *Id*. at 31:20-21.  A female school employee told Daryl
6  that he wasn't allowed to have the comb because it was considered a weapon.  *Id*. at 31:24-32:3.
7  Daryl said "okay" and told her that he was just there to pick up his brother and would leave in a
8  minute.  *Id*. at 32:4-5.
9       After meeting up with Justin and some of his friends, the group walked across the football
10  field.  *Id*. at 32:7-9.  Underhill and a female school police officer asked Daryl to stop and asked
11  him about the comb.  *Id*. at 32:10-33:23.  Underhill told Justin and his friends to go.  *Id*. at 34:14-
12  35:4.  Underhill then asked Daryl his name, social security number and where he goes to school.
13  *Id*. at 35:5-7.  Underhill then told Daryl that he was being warned and if he came back to Hug High
14  School, he would be arrested on sight.  *Id*. at 35:22-24.  Daryl then left.  *Id*. at 35:25.  After this
15  incident, Daryl and Tina went to the school to talk to Principal Kallay.  *Id*. at 36:20-21.  Kallay told
16  Tina and Daryl that Daryl needed to come into the office if he wanted to pick Justin up from
17  school.  *Id*. at 36:21-24.
18       In September, 2004, shortly after the first incident, Daryl drove to Hug High School to pick
19  up Justin.  *Id*. at 40:5-43:10.  Upon arriving at the school, Daryl parked and stood outside the car.
20  *Id*. at 43:24-44:4.  After a few minutes, Underhill and a female officer approached Daryl and told
21  Daryl that he had been told to stay off campus.  *Id*. at 46:15-47:11.  Underhill subsequently ran a
22  "check" on Daryl.  *Id*. at 49:22-24.  The response from dispatch indicated Daryl was a runaway.  *Id*.
23  at 49:24-50:1.  Tina had reported Daryl as a runaway the previous night.  *Id*. at 50:17-19.
24       As a result, Daryl was placed into handcuffs and patted down.  *Id*. at 50:13-51:5; (Defs.'
25  Mot. for Summ. J. (# 57), Dep. of Michelle Burrell, Ex. 12 at 37:4-8; Dep. of Gary Underhill, Ex. 9
26

at 163:11-12.)

Daryl alleges he told Underhill that Underhill did not have to grab his testicles when Underhill was patting him down. (Defs.' Mot. for Summ. J. (# 57), Dep. of Daryl McCarthy, Ex. 4 at 51:18-21.) Underhill allegedly responded by stating that he wasn't grabbing Daryl's testicles. *Id*. at 51:22-23. At that point, Underhill allegedly yanked Daryl's genitals and stated, "that's grabbing your balls." *Id*. at 51:22-24. Underhill denies inappropriately touching Daryl. (Defs.' Mot. for Summ. J. (# 57), Dep. of Gary Underhill, Ex. 9 at 165:12-18.)

Tina showed up to the scene and the officers explained to her why Daryl was being arrested. (Defs.' Mot. for Summ. J. (# 57), Dep. of Michelle Burrell, Ex. 12 at 39:11-24.) Tina told the officers that Daryl was not a runaway. *Id*. at 40:2-3. The officers told the dispatch of Sparks Police Department to check Daryl's status and it eventually came back that Daryl was no longer reported as a runaway. *Id*. at 40:6-14. It is undisputed that Daryl was released from custody after the officers found out he was not a runaway.

The next incident occurred in November, 2004. Daryl and Tina went to Hug High School to pick up Justin. (Defs.' Mot. for Summ. J. (# 57), Dep. of Daryl McCarthy, Ex. 4 at 68:20-22.) Daryl went into the office to ask if he could get Justin out of school. *Id.* at 68:20-69:5. Daryl was told that his mother would have to come. *Id*. at 69:5-6. Daryl went outside and told Tina that he could not get Justin. *Id*. at 69:21-23.

Tina went into the office and Daryl stood by the sidewalk. *Id*. at 69:24-70:6. Underhill drove up and told Daryl that he had been told not to come to Hug High School. *Id*. at 70:8-13. Tina came out and started using profanities and called Underhill a racist. *Id*. at 70:14-24. Tina went to get Principal Kallay. *Id*. at 71:9-16. Kallay told Tina to let the officers do their job. *Id*. at 72:18-19. The school police officers eventually left. *Id.* at 73:24-25. Tina and Daryl then went to get Justin and the three left the school. *Id*. at 73:25-74:1.

Justin had one encounter with Underhill. On an unknown date, Justin was with his friends

3

at Hug High School. (Defs.' Mot. for Summ. J. (# 57), Dep. of Justin McCarthy, Ex. 5 at 16:17-20.) Underhill had received a report that a group of students may have been involved in a rock throwing incident. (Defs.' Mot. for Summ. J. (# 57), Dep. of Gary Underhill, Ex. 9 at 177:15-178:16.) Underhill and another officer stopped Justin and his friends and asked who threw a rock. (Defs.' Mot. for Summ. J. (# 57), Dep. of Justin McCarthy, Ex. 5 at 17:2-6.) The group told the officers they didn't throw a rock and started walking away. *Id*. at 18:5-8. At that point, Underhill told Justin he would be arrested if he did not stop. *Id*. at 18:88-10. Justin stopped and the group eventually left after denying any involvement in the rock throwing incident. *Id*. at 19:3-10. This incident was distinct from the incident where Underhill questioned Daryl about the rat-tail comb. *Id*. at 19:13-5.

Tina submitted two written complaints to WCSD in November, 2004. (Defs.' Mot. for Summ. J. (# 57), Pub. Compl. Form and Compl. for Student Grievances Based on Discrimination, Ex. 6.) Superintendent of Operations Ken Grein ("Grein") responded in a letter dated November 22, 2004. (Defs.' Mot. for Summ. J. (# 57), Nov. 22, 2004, Letter, Ex. 6.) In the letter, Grein informed Tina his investigation revealed no wrongdoing on the part of school police officers. *Id*.

**II. Legal Standard**

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therfrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along

with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001). For those issues where the moving party will not have the burden of proof at trial, the movant must point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325.

In order to successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

**III. Discussion**

Following a motion to dismiss, Plaintiffs have viable claims pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and for negligent supervision and training. Defendants seek summary judgment on both claims. The court will discuss each cause of action below.

**A. Title VI**

Defendants seek summary judgment on Plaintiffs' Title VI claim arguing that Plaintiffs have no evidence of intentional racial discrimination. Defendants further argue there is no nexus between the alleged intentional discrimination and federal funding. Plaintiffs oppose summary judgment arguing there is sufficient evidence of intentional discrimination and the requisite federal funding.

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d. This provision creates a private right of action for both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To state a claim for damages under Title VI, a plaintiff must allege that (1) the entity involved is engaging in racial discrimination, and (2) the entity involved is receiving federal financial assistance. *Fobbs v. Holy Cross Heath Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001). Discrimination must be intentional in order to be actionable under Title VI. *Sandoval*, 532 U.S. at 280. In addition, a plaintiff must prove that he is an intended beneficiary of the federally-funded program at issue. *The Epileptic Found. v. City and County of Maui*, 300 F.Supp.2d 1003, 1011 (D. Haw. 2004) (citing *Wrenn v. Kansas*, 561 F.Supp. 1216, 1212 (D. Kan. 1983)).

Looking at the evidence in the light most favorable to Plaintiffs, the court finds no evidence of intentional discrimination. As an initial matter, the court notes that Justin is the only Plaintiff who has a viable Title VI claim. (February 17, 2006, Order (# 29) at 4.)[2] Plaintiffs first try to establish evidence of intentional discrimination by arguing seventy-five percent of the student body

---

[2] Plaintiffs previously acquiesced to Defendants' argument that Daryl is not a proper Title VI plaintiff.

at Hug High School consists of minorities. Although Plaintiffs are correct that Hug High School is largely composed of minority students, (Pls.' Opp'n (# 71), Dep. of Paul Dugan, Ex. 12 at 80:9-15), such statistics do not suggest intentional discrimination.

Plaintiffs next cite to the deposition testimony of Underhill. At his deposition, Underhill indicated that he felt school police had to regain control of the school. (Defs.' Mot. for Summ. J. (# 57), Dep. of Gary Underhill, Ex. 9 at 75:21-76:6.) Mieras had also communicated this statement to Underhill. *Id.* at 77:22-24. However, nothing in this statement indicates school police were treating students differently on account of their race. Rather, Underhill and Mieras made the statement in response to problems that were occurring at Hug High School. Specifically, Underhill indicated Hug High School was having problems in terms of drugs, gang activity, fights and that it was not a positive learning environment. *Id.* at 79:1-23.

Plaintiffs next argue Underhill's arrest record shows discriminatory intent. Plaintiffs specifically rely on Defendants' answers to interrogatories, which indicate Underhill made ninety-one arrests and gave sixty-two citations. *See* (Pls.' Opp'n (# 71), WCSD's Answers and Objections to First set of Interrogs., Ex. 9.) Plaintiffs have not, however, provided any evidence as to the race of the students involved or whether a disproportionate number of minority students were involved.

Plaintiffs also argue several instances of discrimination occurred and were sanctioned by the administration in the 2003-2004 school year. Patrick McGuire ("McGuire"), a teacher, testified that a vice-principal by the name of Redmond singled out Hispanic and African-American students for suspensions. (Defs.' Reply (# 72), Dep. of Patrick McGuire, Ex. B at 15:3-12, 16:12-21.) This testimony fails to create a genuine issue of material fact. McGuire's testimony does not identify any individual other than Redmond that discriminated against minority students. Furthermore, the evidence regarding Redmond indicates he worked for WCSD during the 2003-2004 school year. *Id.* at 15:16-21. There is no evidence that Redmond is still employed with the WCSD. Finally,

7

there is no evidence that Redmond was involved with any decision regarding Justin.

Plaintiffs next rely on the testimony of Debra Feemster, Diversity Coordinator for WCSD. During her deposition, Feemster indicated she had seen certain individuals treat students of color unfairly. (Pls.' Opp'n (# 71), Dep. of Debra Feemster, Ex. 15 at 51:11-18.) This testimony fails to establish a genuine issue of material fact because Feemster explicitly opined that the discrimination was not deliberate. *Id*. at 51:21-23.

Plaintiffs also rely on the double-hearsay statement of Feemster who was told by a teacher's aide that a teacher allegedly said, "they need to get rid of all black kids." *Id*. at 57:12-16. This double-hearsay statement is inadmissible and cannot be considered in a motion for summary judgment. *See* Fed. R. Evid. 801, 802; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.") Even if this statement were admissible, it fails to show the actions taken against Justin were intentionally discriminatory. There is no indication that the teacher who allegedly made the statement at issue played any role in the events of this case.

Finally, Plaintiffs argue WCSD had a dropout prevention policy that was not applied to African-American students. Plaintiffs have provided evidence indicating that "graduation specialists" contact students that have failed one or more classes and have had one or more absences. (Pls.' Opp'n (# 71), Dep. of Eric Beye, Ex. 11 at 21:13-25.) Furthermore, there is evidence indicating Justin was not contacted by a graduation specialist. (Pls.' Opp'n (# 71), Aff. of Tina McCarthy, Ex. 21 ¶ 4.)

Once again, the court finds this evidence insufficient to suggest intentional discrimination. The fact Justin was not contacted by a graduation specialist is not, by itself, evidence of discrimination. Plaintiffs have provided no evidence as to whether other, non-African American, students were contacted by the graduation specialist. It is certainly possible the graduation specialist failed to contact students of all races. Without evidence indicating African-American

students were denied contact with the graduation specialist while other non-African-American students had such contact, the court cannot say that the failure to contact Justin is evidence of intentional discrimination.

Thus, the court finds Defendants met their initial burden of demonstrating no evidence supports Justin's Title VI claim. Plaintiffs failed to rebut the motion by setting forth evidence that demonstrates a genuine issue of material fact. As such, summary judgment will be granted on Justin's cause of action pursuant to Title VI.

**B.  Negligent Supervision and Training**

Plaintiffs' second cause of action states a claim for negligent supervision and training. Defendants seek summary judgment arguing there is no evidence any defendant was unfit for their job. Furthermore, Defendants argue there is no evidence of antecedent events that would have given WCSD pause in hiring any of the defendants. Plaintiffs oppose summary judgment arguing that evidence shows WCSD was negligent in the hiring and training of Underhill.

"'The tort of negligent hiring imposes a general duty on the employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position.'" *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996) (quoting *Burnett v. C.B.A. Sec. Serv.*, 820 P.2d 750, 752 (Nev. 1991)). "An employer breaches this duty when it hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities." *Id*. (citing *Kelley v. Baker Protective Services, Inc.*, 401 S.E.2d 585, 586 (Ga. 1991)). Employers also have a duty to use reasonable care in training, supervision, and retention of his or her employees to make sure that employees are fit for their positions. *Id*. (citing 27 Am. Jur. 2d *Employment Relationship* §§ 475-76 (1996)).

As evidence of negligent hiring, Plaintiffs first rely on the deposition of Underhill. It is undisputed Underhill testified that he had previously applied to the Sparks Police Department. Underhill was told he was not hired because he did not pass his "department psych." However,

9

Underhill later found out he did pass and was not hired due to a personal conflict.

As an initial matter, Plaintiffs have provided no evidence Underhill actually failed any psychological exam. Underhill believes he passed the exam. Nevertheless, even if Underhill failed the exam, there is no evidence that the failing of the exam is in any way related to the allegations in this case. In order for an employer to be liable for negligent hiring, there must be evidence that the employer's negligence caused the alleged injury. *See Hall*, 930 P.2d at 98; *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1226-27 (Nev. 1996). Here, there is no evidence indicating what the psychological exam tests are for or why Underhill allegedly failed the exam. More importantly, Plaintiffs have presented no evidence that Underhill was involved with unlawful arrests or excessive force prior to being hired by WCSD. Finally, Plaintiffs have presented no evidence WCSD failed to conduct a reasonable background check.

Plaintiffs next rely on a May 12, 2005, evaluation of Underhill. The evaluation indicates Underhill "needs to transition from a traditional law enforcement agency to a specialized (school district police) agency." (Pls.' Opp'n (# 71), May 12, 2005, Employee Performance Evaluation Report, Ex. 7.) Although this unauthenticated document indicates Underhill needed to make a "transition," it does not demonstrate WCSD was negligent in failing to train Underhill. If anything, the evaluation demonstrates WCSD was working with Underhill to improve his job performance.

Plaintiffs also argue the number of arrests and citations issued by Underhill show negligent training and hiring. As previously mentioned, Underhill made ninety-one arrests and gave sixty-two citations during the 2004-2005 school year. (Pls.' Opp'n (# 71), WCSD's Answers and Objections to First set of Interrogs., Ex. 9.) This factual statement is not evidence of negligent training or supervision. Plaintiffs have provided no evidence regarding the circumstances of those arrests and citations. Thus, there is no evidence to indicate any wrongdoing on the part of Underhill or WCSD.

Plaintiffs cite to an Internal Affairs investigation conducted by the Reno police department

as evidence of negligence. In an Internal Affairs memorandum dated June 1, 2005, it was found that Underhill violated the school police discretion policy and the courtesy policy in the arrest of a student who was trespassing. (Pls.' Opp'n (# 71), June 1, 2005, Internal Affairs Mem., Ex. 8.) The court finds this unauthenticated document insufficient to create a genuine issue of material fact. The incident involving the student occurred several months after the events that led to this case. *See id.* Thus, any failure to supervise Underhill or train Underhill as a result of his conduct in that case does not show WCSD failed in its duty to properly supervise Underhill several months before the conduct occurred.

Furthermore, the evidence specifically shows an internal affairs investigation occurred after a complaint was filed. Upon sustaining the violations of the courtesy and discretion policies, the investigator recommended that the case be forwarded to the Washoe County School District Police Department for final determination. *Id*. There is no evidence WCSD failed to counsel Underhill regarding his actions or to provide any training that may have been necessary. In short, the fact Underhill may have violated school police policies does not show WCSD was negligent in its hiring or supervision of Underhill.

Finally, Plaintiffs argue superintendent Paul Dugan ("Dugan") and Mieras were aware of numerous complaints against Underhill and failed to act until the end of the school year. Plaintiffs have presented evidence that Dugan was familiar with several complaints against Underhill during the 2004-2005 school year. (Pls.' Opp'n (# 71), Dep. of Paul Dugan, Ex. 12 at 78:4-7.) Dugan testified that he had discussions with Mieras and Grein in response to this knowledge. *Id*. at 78:8-10. Plaintiffs have provided no evidence indicating WCSD failed to investigate the complaints or provide training and supervision to Underhill. Thus, Plaintiffs have failed to rebut Defendants' properly-supported motion and summary judgment will be granted.

///

///

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (# 57) is hereby GRANTED.

The Clerk of the court shall enter judgment accordingly.

IT IS SO ORDERED.

DATED this 25th day of March, 2008.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE